JOHN KILLEN, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

The evidence as contained in the record, justifies the verdict of guilty, and this Court will not in such cases reverse the judgment of the Judge in refusing a new trial.

New trial. Before Judge PATE. Pulaski Superior Court. April Term, 1873.

John Killen was placed on trial for the offense of murder, alleged to have been committed upon the person of one Jerry Mabin, on March 29th, 1873. The defendant pleaded not not guilty. The jury found to the contrary. Whereupon the defendant moved for a new trial upon the ground that the verdict was contrary to the evidence.

The testimony was as follows:

FOR THE STATE.

ISAAC WILLIAMS, sworn: Was about a half mile from Dykesboro, at John County's house, where the fuss happened between them. John Killen got up and got the gun; Jerry got up and got the hatchet. John walked out the door to the gate. Jerry said to him "Never mind, I will see you again." John walked back and took the corner of the house on him. Jerry came up and stood in the door, and at

that time John shot—John Killen, the prisoner at the bar; he shot Jerry Mabin; he shot with a double barrel gun. Do not know what the gun was loaded with. Did not see the deceased after the shooting. The shooting took place on the 29th of March, 1873, in Pulaski county, in the State of Georgia. It was all done in ten or fifteen minutes. From the time of the commencement to the time of the shooting, witness could not have walked further than from here (the Court-house) over to the hotel, (one hundred and fifty-eight and one-half feet by measurement.) Was standing at the gate when he was shot. Saw hatchet in Jerry's hand while in the house; saw no hatchet afterwards; do not know if he had any hatchet in his hand at the time of the shooting. He stayed in the house; never did come out. It was at night. Jerry cursed John, but not much. Jerry called John a damned liar. After the damned lie was passed, both did not jump up immediately, one taking the gun and the other the hatchet. Jerry did not get the hatchet immediately. John got the gun and Jerry got the hatchet. Jerry sat down, and when John got the gun, Jerry got up and got the hatchet. I tried to keep them from fighting; they seemed anxious to fight. One other party tried to separate them. Did not let them get together and hurt each other at that time. John went out and Jerry went to the door. John, when Jerry told him "I will see you again," did not immediately shoot, but went sideways around to the corner of the house. From the gate to the door was about as far as I am from General Warren. Parties were friends, until Jerry gave John the damned lie. There was no light in the house. There was a candle in the house; after all went out except Perry and the deceased, Perry put the light out. Both seemed mad and excited. Jerry Mabin gave John Killen the damned lie repeatedly, and cursed him severely. Jerry Mabin did not live in the house; he lived one-quarter of a mile from the place where the killing took place. After the shooting, John Killen, the prisoner, came on down to the station at Dykesboro. Jerry was a much larger man than John. The gun was sitting in the

Killen *vs.* The State of Georgia.

direction pointed out by the witness to the Court and jury, from the parties, and John got up and walked around the deceased and got the gun.   The hatchet was in the same corner where the gun was.   I was not drunk.   Don't think that John was drunk.   Jerry had sense enough to play.   Don't know whether they were excited by liquor.   John had been drinking.   Don't know whether the others had or not.   Don't know the size of the hatchet.   It was large enough to kill a man with—to split his head open.

JOHN COUNTY, sworn: The killing was done when I got there.   I left them at my house, they promising to behave until I got back.   I left to get provisions.   When I got home the man was killed, in the house, and they were gone. By the door the chop axe was laying, pretty much where I left it, by a bag of bran, where I was feeding my chickens. Jerry, the deceased, was behind the door.   He was about eight feet from the place where he was sitting when I left, in the relative position pointed out to the Court and jury.   The bag was about four feet from the door, and the hatchet was lying against the bag.   Hatchet and man were on the same side of the door, but the man was behind the door.   I was at Mr. O'Berry's store when I heard the gun, about a quarter of a mile distant.   I hurried home through the woods fast. No one there.   When I got there, I made a fire and stayed with him.   Jerry was shot; he was dead.   This is all I know about it.   Saw no wounds; did not examine the deceased.   I stayed there until they carried me to the guard house on Sunday morning.   I don't know who shot the deceased, or commenced or ended the difficulty.   The hatchet I left within four feet of the door, but it was not in the corner of the house.   Don't know whether the hatchet had been moved or not.   The hatchet I called a chop axe, the blade was about six inches; a man could be killed with it.   Jerry was much larger than John, being a tall man.   He was a strong and healthy looking man.   The gun was gone when I returned.   The gun was loaded with bird shot.   The gun was sttting up in the corner, in the right hand corner as you

Killen *vs.* The State of Georgia.

go in.    Don't know whether the parties were drinking or not. Did not see them handling any liquor.

CHARLEY MULLIS, sworn: I saw the deceased in the house where he was killed, or where they said he was killed. From the wound he looked like he was shot with a gun and killed. I think he was wounded in the right breast, but as to the number of the holes, I am unable to state them, for I could not count them; sometimes there seemed to be four or five together. I did not try to count them. The wounds seemed to be made by small bird shot, that is from the appearance of the holes. They were sufficient to produce death. The party doing the shooting must have been very near.

### FOR THE DEFENSE.

PERRY GRADY, sworn: I was present when the difficulty took place; the deceased said to Ike, what do you mean by holding the cards; says he could hold just as many cards as he could; the deceased said that it was a God damned rascally trick; said this to Ike. Deceased said to John that he had been drawing a gun on some of the boys, and God damn you, we will see you for it. Deceased at the time had the hatchet in his hand. John and Jerry were standing about as far apart as the distance shown to the jury. When John fired his gun the deceased had the hatchet in his hand; I was in the house when the parties got the gun and hatchet; don't know which got the gun or hatchet first; I was trying to keep them from fighting; don't know which started to get the gun or hatchet first; they were scrambling about there, and I told them not to have a fuss, as John County told them not to have a fuss; then this man, Jerry, said he would not have any fuss; don't know which jumped up first; they both jumped up and were scrambling about there; Jerry had the hatchet when I saw him. It was all done mighty quick; John Killen backed out of the house; Jerry was standing at the trunk when they were playing, but he walked and came to the door; he, Jerry, the deceased, said he would not have any fuss; John said that he did not aim to play with him any more.

Killen *vs.* The State of Georgia.

He told him to come and he would give John Killen fifty cents, and beat him out of seven; then John shot him; then he ran up towards the door like he was going to shoot him again.   Jerry's reply that he would not have any fuss was in answer to the request of me not to have any fuss.   The last conversation was to come back in the house and play cards; John said that he was not going to play with him any more. John Killen went out backwards with a gun in his hands; when John Killen went out Jerry was standing by the trunk. I did not tell counsel that Jerry was following John when he was backing out; I did not tell counsel that both jumped up at the same time.   I did not know that the gun was there; I knew the hatchet was there.   I could not tell which one got the weapons first.   When they were running about John had nothing in his hands; John got the gun; I don't know where he got the gun; he had it when I saw him.   I don't know which got the hatchet or gun first.   I told counsel that John backed out, but I did not tell counsel that Jerry was following him.   We all went out in a hurry.   The difficulty was going on about five minutes as near as I could guess; from the commencement of the difficulty to the time the gun fired I don't know how far I could have walked.   Parties seemed to me to be friends; I don't know which was the bigger; the deceased was higher than John Killen.   When they jumped up and got to running around I don't know which got the gun or hatchet first; when I first saw the gun it was after the scrambling; I thought they were scrambling for the hatchet or adz; I thought he was making for the hatchet or foot adz. He had to go right by Jerry to get the gun; I run and got the light and blowed it out myself; I then run out immediately ; I left Jerry in the house when I came out; Jerry was standing at the trunk when I came out; it was dark ; after I got out of the house John run towards the door and fired the gun ; the moon was shining and I could see; when I ran out of the house Jerry had the hatchet in his hand; I was badly scared; after the gun fired the first time, John fired again; at the second shot he hit Henry and me.   I testified before in

this affair, at Dykesboro; I swore to the truth then. I thought that Jerry was talking to Ike when the misdeal was made, because Ike had the cards in his hands. John Killen and the deceased were the men that got up and were running round; I thought they were after the hatchet or foot adz.

O. C. HORNE, sworn: Perry Grady stated to the counsel that when the prisoner was backing out of the house with the gun, deceased was following him with the hatchet; that counsel could prove the same by him. Says that they were consulting with witness, Perry Grady, to see whether they should put him on the stand or not; we were talking in a low tone or whisper, but very distinctly; cannot say but what he might have misunderstood us, but we did not misunderstand him; as a natural consequence, the chances of misunderstanding the witness, and he us, talking in the Court-house as we did, might have been greater than if we had been talking out of the house; the conversation took place in the Court-house, but we were particular enough to repeat the questions often enough to understand him distinctly, as we thought.

W. L. GRICE, sworn: I understood him to say that both jumped up from the table together, and that when John walked out with the gun, Jerry was following him with the hatchet. Have been moderately zealous in the defense of this case. Conversation took place within the bar, and in a whisper; he may have misunderstood our questions and assented to them unintentionally. It was my distinct understanding that his testimony would be as I have stated.

STATEMENT OF THE PRISONER, JOHN KILLEN: We were all sitting down playing cards, and there came up a misdeal; Jerry said, what in the hell are you up to; if that is what you are up to, holding cards, I can hold as many cards as any damned man. I said to him, gentlemen, there is no use in so much cursing about it; any man was liable to make a misdeal; and he said that it was a God damned lie; that nobody would do it but a God damned rascal and a God damned son of a bitch. I then asked him what he said. He said it again—"you God damned son of a bitch,"—and then we both

rose up and began to make for something to defend with. At that time we both got hold of the weapons, and Jerry was making at me with the hatchet, and struck at me with it; I kept backing from him until I got out of doors, he still pursuing me with the hatchet, and as I got out of the door, I shot; I did not know whether I hit him or not, and as I whirled to run, by having the other barrel cocked, it went off; I did not intend to shoot it.

The motion was overruled, and the defendant accepted.

WARREN & GRICE; O. C. HORNE, for plaintiff in error, submitted the following brief:

The killing was justifiable homicide: Irwin's Rev. Code, 836, section 4254; *Ibid.*, 836, 7, sections 4254, 5, 6; *Ibid.*, 838, section 4264; Monroe *vs*. The State, 5th Georgia Reports, 85, 132; Ray *vs*. The State, 15 *Ibid.*, 223, points 4, 5; Stokes *vs*. The State, 18 *Ibid.*, 17, point 1, 36; Keener *vs*. The State, 18 *Ibid.*, 194, point 10, 232; Golden *vs*. The State, 25 *Ibid.*, 527, points 4, 5, 532–3; Wharton's American Criminal Law, 987, 990, 992, 1020.

But if this was and is not a case of justifiable homicide, as we think and contend it *was*, then it cannot be a higher grade of homicide than manslaughter. The proof was, that the parties were friends up to the time of the difficulty; was provoked by the deceased without cause; that there was great excitement between the parties during the difficulty, and which got up instantaneously; the passions of the parties were greatly aroused, and during that time, and before the end of that state of things, and before there was time for passion to subside and reason to resume its throne, it being only from one to five minutes from the first to the last of the difficulty, and while deceased still had his said deadly weapon in his hand, when plaintiff in error fired his gun, that it was certainly a less grade of crime, if a crime at all, than murder. And in support of this view of the matter, without abandoning or yielding the first, we refer to the following authorities: Irwin's Code, 837, secs. 4258, 9; Ray *vs*. The State; Stokes *vs*. The

State; Keener *vs*. The State, already referred to; and also Gann *vs*. The State, 30 Georgia Reports, 67 ; Alford *vs*. The State, 33 *Ibid.*, 303; Wharton's American Criminal Law, 933, sec. 932 ; *Ibid.*, 987, secs. 987–8 ; *Ibid.*, 988–9, 990.

No appearance for the State.

McCay, Judge.

As there is no exception taken in this case to the charge of the Court, we are driven to the assumption that it was such a charge as, under the evidence, was strictly in accord with the law applicable to the facts as proven.   The only ground taken in the motion for new trial is, that the verdict is contrary to the evidence ; that, under the laws of this State, the facts do not authorize a conviction of murder.   We will not repeat what we have so often said, that this Court has no authority to grant a new trial over the affirmance of a verdict by the presiding Judge, unless the evidence fails, altogether, to justify the verdict.   It is to us most manifest that the evidence, as contained in this record, fully sustains the verdict.   To call this killing a case of justifiable homicide, would, as we think, be a perversion of the law.   The evidence is very strong that at the time of the killing the prisoner was in no danger.   He had left the house.   He was out of the reach of deceased's weapon, even if *he* (the deceased) was indicating any intention to use it.   Having in his own hand ·a gun, he had the sure means of protecting himself should deceased advance upon him.   Besides, if deceased was, at the time, coming at him, the prisoner had every opportunity to get out of the way.   There is nothing in his conduct going to show that he (the prisoner) was declining "*further* struggle," as required by section 4267 of the Revised Code, in cases of this sort—that is, in cases of *self-defense* from danger to life during a quarrel, when both sides are not without blame.   Nor can the verdict be fairly attacked on the ground that the evidence *demanded* a verdict of only manslaughter.   The jury had a right to believe from this evidence that there was

plenty of time, after the hot words and mutual indications *in* the house of an intent to fight, for the passions to cool and reason to resume its sway ; that the deceased had declared his intent to have no fuss ; that he went to the door in a peaceful spirit; that he spoke to the prisoner at the door in a spirit of reconciliation.   They had a right, too, from the evidence, to believe that the prisoner, after he got to the gate, in front of the door, " took the corner of the house on the deceased," and that, himself protected, and partially hidden, he awaited the coming of deceased to the door, and shot in the spirit of assassination.   They had a right, too, from the evidence, to believe that he was not satisfied with one shot, but that he shot a second time and rushed towards deceased after he had given the deadly wound.   All this is in the evidence, and the jury may, as they had a right to do, have thought this the true version of the affair.   If this be the true version, then, here was time to cool ; here was intent to kill ; here was the deliberate intent to take away life ; and, as the law says, this constitutes the so doing, murder.

It is painful to be the instrument of the law to impose its penalties upon the guilty.   But the protection of society against murder is a high duty, and, though mercy may plead in moving terms, yet justice has imperative demands that may not be disobeyed.

Judgment affirmed.